O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

VICTORIA GONZALEZ, on behalf of herself and all others similarly situated,

Plaintiff,

v.

DREW INDUSTRIES INC., a Delaware corporation; KINRO, INC., an Ohio corporation; KINRO TEXAS LIMITED PARTNERSHIP, a Texas limited partnership, d/b/a BETTER BATH COMPONENTS; and SKYLINE CORPORATION, an Indiana corporation,

Defendants.

Case No. CV 06-08233 DDP (JWJx)

**ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT; GRANTING APPLICATION TO SUBMIT SUPPLEMENTAL BRIEFING**

[Motion filed on December 23, 2008, Dkt. No. 267; App. for Supp. Briefing filed on March 23, 2009, Dkt. No. 341]

**I.    BACKGROUND**[1]

Plaintiffs Victoria Gonzalez ("Gonzalez") and Robert Royalty ("Royalty") bring this suit against Defendants Kinro, Inc. ("Kinro") and Kinro Texas Limited Partnership ("Kinro Texas LP"), based on the alleged fire risk of bathtubs manufactured by Defendants and sold under the name "Better Bath," and the representations and warranties on labels affixed to these bathtubs.

---

[1] The only remaining defendants in this action are Kinro, Inc. and Kinro Texas Limited Partnership.

In their Second Amended Complaint ("SAC"), Plaintiffs allege that (1) Defendants sold defective bathtubs to Plaintiffs that did not comply with mandatory federal fire-safety standards; and (2) Defendants misrepresented their bathtubs' compliance with these fire-safety standards.

Defendants[2] make and sell ABS plastic bathtubs for manufactured homes.[3]  ABS is acrylonitrile butadiene styrene, a type of plastic used in various commercial applications.  (Gibbs Decl. Ex. L at 4.)  ABS plastic is flammable, although the exact temperature at which it catches fire depends on whether other materials (e.g., fire retardant) are added to the plastic mixture. (Id.)  Defendants state their bathtubs are "principally" made from either (1) plain ABS plastic ("plain ABS") or (2) ABS plastic with an acrylic cap ("acrylic ABS").[4]  (Plaintiff's Statement of Genuine

---

[2] The parties dispute whether both Kinro and Kinro Texas LP manufacture bathtubs.  As discussed below, the Court finds there is a genuine dispute of material fact as to whether these entities make and sell bathtubs together and, accordingly, the Court will refer to them jointly as Defendants in discussing the parties' evidence and argument.

[3] A "manufactured home" is defined as "a structure, transportable in one or more sections, which, in the traveling mode, is eight body feet or more in width or forty body feet or more in length, or, when erected on site, is three hundred twenty or more square feet, and which is built on a permanent chassis and designed to be used as a dwelling with or without a permanent foundation when connected to the required utilities, and includes the plumbing, heating, air-conditioning, and electrical systems contained therein . . . ."  42 U.S.C. § 5402(6).

[4] Plaintiffs dispute Defendants' description of the composition of their bathtubs as a "gross oversimplification" that ignores the "many differences in the ABS [plastic] Kinro has used that affect the [fire safety] rating of a finished bathtub."  (SGI ¶ 5.)  Any oversimplification is relevant, because Plaintiffs argue that Defendants have failed to track the materials which comprise their plastic bathtubs, which undermines the reliability of their fire-safety testing.  (See SGI ¶ 5-6.)

1   Issues ("SGI") ¶ 5.)   Approximately 85 percent of the bathtubs

2   manufactured by Defendants are made with plain ABS plastic.  (SGI ¶

3   5.)

4        The Department of Housing and Urban Development ("HUD")

5   imposes safety requirements on manufactured homes, including

6   flammability standards for bathtubs made of ABS plastic.

7   Specifically, "[f]inish surfaces of plastic bathtubs, shower units,

8   and tub or shower doors shall not exceed a flame spread rating of

9   200."[5]  24 C.F.R. § 3280.203(b)(6).  The parties dispute the

10  meaning of the term "finish surface," as required by the

11  regulation, and at what point testing may be performed on material

12  comprising the finished bathtub.  However, federal regulations

13  require that bathtub manufacturers ensure a flame spread rating of

14  200 or less on the finish surface of tubs, through the use of one

15  of three alternative testing methods:  1) the Standard Test Method

16  for Surface Burning Characteristics of Building Materials, ASTM

17  E84-01, 2001 (the "E84 protocol"); 2) the Standard Method of Test

18  of Surface Burning Characteristics of Building Materials NFPA 255,

19  1996; or 3) the Standard Test Method for Surface Flammability of

20  Materials Using a Radiant Heat Energy Source, ASTM E 162-94 (the

21  "E162 protocol").  Id. § 3280.203(a).  The two tests that are

22  relevant to the dispute here are the E84 and E162 protocols.  The

23  above testing is also required to be performed by "nationally

24  recognized testing laboratories which have expertise in fire

25  technology."  Id. § 3280.209.  While bathtubs must be compliant

26  ─────────────────

27       [5] Flame-spread, or "surface flame spread," is defined by the
    ASTM standards as "propogation of flame away from the source of
28  ignition across the surface of the specimen."  (Gibbs Decl. Ex. YY
    at 12.)

1  with HUD standards before they can be sold, there is no requirement
2  that bathtub manufacturers (versus manufactured home sellers)
3  advertise or represent to consumers that their bathtubs comply with
4  federal fire-safety standards.

5      In November 2005, Gonzalez purchased a manufactured home that
6  contained a bathtub made by Defendants. (SGI ¶ 11.)  Royalty
7  purchased a manufactured home with a bathtub made by Defendants in
8  December 2006. (SGI ¶ 18.)  Gonzalez's bathtub is made of acrylic
9  ABS plastic. (SGI ¶ 39.)  Royalty's bathtub has not been tested
10  and there is no direct evidence as to what materials are in his
11  tub, but Royalty states that his bathtub is a "Better Bath ABS
12  bathtub" (Royalty Decl. ¶ 5), which Defendants do not contest.

13      After Plaintiffs purchased their manufactured homes, they
14  noticed stickers on their bathtubs, though they do not state how
15  many stickers were present or what exactly they said.  Defendants
16  provided four stickers to Plaintiffs in discovery (see Gibbs Decl.
17  Ex. G), but the parties do not clarify whether these particular
18  labels were affixed to either Gonzalez's or Royalty's bathtubs.
19  Gonzalez states that her bathtub had a "small label" that mentioned
20  "safety in 200 or something" and said that the tub was "safe."
21  (SGI ¶ 17.)

22      Before July 17, 2007, Defendants placed labels on some of
23  their bathtubs stating that the bathtubs were certified pursuant to
24  ASTM E162.[6]  (Mitchell Decl. ¶ 16; D.'s Answer ¶¶ 22-23.)

25

26

---

27      [6] Defendants state that they ceased placing the label
28  referring to the E162 protocol in July 2007. (Mitchell Decl. ¶ 16.)

Defendants also placed a warranty on <u>all</u> of their bathtubs which states:

> Under normal use and service, should a unit be termed defective by an authorized Better Bath representative, within [a specified number of years] from original consumer purchase, it will be the manufacturer's option to repair or replace the defective unit or component.

(SUF ¶ 42.)  This language is an exact quote from three of the warranty stickers provided by Defendants to Plaintiffs in discovery, which is, combined with Plaintiffs' other evidence, at least circumstantial evidence[7] that they placed these warranty stickers on all of their bathtubs, and therefore on Plaintiffs'.  Defendants' warranties state that the bathtubs are "[t]ested for flammability in accordance with HUD Mobile Home Construction and Safety Standards Section 3280; 203(a)(6), 3280.604 and .607"; and that "[t]est results meet or exceed ASTM E-162 surface flammability of materials using a radiant heat energy source."  (Gibbs Decl. Ex. G.)

The remainder of the parties' evidence goes to whether Defendants actually complied with federal fire-safety standards under 24 C.F.R. § 3280.203(b)(6), which they heavily dispute and will be discussed where relevant below.  The dispute can be briefly summarized as follows.  From 2001 to 2007, Defendants used the E162 protocol to test all of their plastic bathtubs, which they argue

---

[7] Plaintiffs do not provide direct evidence that warranty stickers stating compliance with fire-safety or federal regulation were placed on their bathtubs.  However, for the purposes of this motion, it is reasonable to infer based on the evidence provided by Plaintiffs, the non-moving party, that the warranties which Defendants concede they placed on Plaintiffs' bathtubs were also the warranties (with matching language) supplied by Defendants to Plaintiffs in discovery.

1   produced results with a flame spread rating below 200.  (SGI ¶ 9.)

2   Plaintiffs dispute that this testing was done according to

3   regulations, and whether Defendants produced contrived results to

4   satisfy the fire-safety standards.  (_Id._)  After Gonzalez filed

5   suit, Defendants sent a number of their bathtubs to be tested using

6   the E84 protocol, which they again argue produced results with a

7   flame spread rating below 200.  (SGI ¶¶ 53-55.)  Plaintiffs, again,

8   dispute whether the E84 protocol was performed according to

9   established testing standards.  (_Id._)

10      Plaintiffs assert six claims in their Second Amended Complaint

11  ("SAC"):

12      1) violation of the Magnuson-Moss Warranty Act ("Magnuson-Moss
        Act"), 15 U.S.C. § 2301 _et seq._;
13      2) breach of express warranty;
        3) concealment or nondisclosure of a product defect;
14      4) violation of the California Consumer Legal Remedies Act
        ("CLRA"), Cal. Civ. Code § 1750 _et seq._;
15      5) violation of the California Unfair Competition Law ("UCL"),
        Cal. Bus. & Prof. Code § 17200 _et seq._; and
16      6) violation of the California Song-Beverly Consumer Warranty
        Act ("Song-Beverly Act"), Cal. Civ. Code § 1790 _et seq._

17  (SAC at 17, 18, 20, 22, 24, 26.)  Defendants now move for summary

18  judgment on all claims.

19  **II.  LEGAL STANDARD**

20      Summary judgment is appropriate where "the pleadings, the

21  discovery and disclosure materials on file, and any affidavits show

22  that there is no genuine issue as to any material fact and that the

23  movant is entitled to a judgment as a matter of law."  Fed. R. Civ.

24  P. 56(c).  A genuine issue exists if "the evidence is such that a

25  reasonable jury could return a verdict for the nonmoving party,"

26  and material facts are those "that might affect the outcome of the

27  suit under the governing law."  _Anderson v. Liberty Lobby, Inc._,

28

1  477 U.S. 242, 248 (1986).  On a motion for summary judgment, all

2  justifiable inferences from the evidence must be drawn in favor of

3  the nonmoving party.  Anderson, 477 U.S. 242, 255 (1986).  However,

4  no genuine issue of fact exists "[w]here the record taken as a

5  whole could not lead a rational trier of fact to find for the non-

6  moving party."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,

7  475 U.S. 574, 587 (1986).  The existence of merely a "scintilla of

8  evidence in support of the non-moving party's position is not

9  sufficient."  Triton Energy Corp. v. Square D Co., 68 F.3d 1216,

10 1221 (9th Cir. 1995)(citing Anderson, 477 U.S. at 252).

11 **III. DISCUSSION**[8]

12     A.  Standing

13     Standing is a jurisdictional limitation on all federal courts

14 and an essential part of the Article III "case or controversy"

15 requirement.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560

16 (1992).  A plaintiff has the burden of establishing the three

17 elements of standing:  (1) an injury in fact that is concrete and

18 particularized, and actual or imminent; (2) a causal connection -

19 that the injury is fairly traceable to the challenged conduct; and

20 (3) a likelihood the injury can be redressed by a favorable court

21 decision.  Salmon Spawning & Recovery Alliance v. Gutierrez, 545

22 F.3d 1220, 1225 (9th Cir. 2008)(citing Lujan, 504 U.S. at 560-61).

23 Additionally, the degree of proof necessary to establish standing

24 differs at the various stages of litigation.  Lujan, 504 U.S. at

25

26

27     [8] Defendants filed a request to submit additional evidence,

28 which Plaintiffs then responded to with evidence of their own.  The Court accepts and has considered this evidence where noted infra.

1  560-61.  The parties' burden here is governed by the standard for

2  summary judgment.[9]  Id. at 561.

3          1.   Injury in Fact

4     In order to demonstrate an injury in fact, a plaintiff must

5  demonstrate an "invasion of a legally protected interest which is

6  (a) concrete and particularized, and (b) actual or imminent, not

7  conjectural or hypothetical."  D'Lil v. Best W. Encina Lodge &

8  Suites, 538 F.3d 1031, 1036 (9th Cir. 2008).

9     Defendants' standing arguments are substantially the same

10 under Article III and the UCL and CLRA, which have their own

11 statutory standing requirements.  The parties also have not

12 described any meaningful distinction between these standards, which

13 the Court will thus analyze under the UCL below.  See e.g.,

14 Buckland v. Threshold Enterprises, Ltd., 155 Cal. App. 4th 798,

15 814-16 (Cal. Ct. App. 2007)(analyzing standing requirements

16 concurrently under both the UCL and Article III, pursuant to the

17 stated intent of Proposition 64, which amended the UCL); but see

18 Kwikset Corp. v. Superior Court, 2009 Cal. App. LEXIS 213, *9-11

19 (Cal. Ct. App. App. 2009)(analyzing injury in fact separately under

20 the UCL).

21          2.   Causation

22 _____

23     [9] "Since [standing requirements] are not mere pleading
   requirements but rather an indispensable part of the plaintiff's
24 case, each element must be supported in the same way as any other
   matter on which the plaintiff bears the burden of proof, i.e., with
25 the manner and degree of evidence required at the successive stages
   of the litigation . . . At the pleading stage, general factual
26 allegations of injury resulting from the defendant's conduct may
   suffice, [but on] a summary judgment motion . . . the plaintiff can
27 no longer rest on such mere allegations, [and] must set forth by
   affidavit or other evidence specific facts, which for purposes of
28 the summary judgment motion will be taken to be true." Lujan, 504
   U.S. at 561 (internal quotations omitted).

1    Defendants argue that Plaintiffs' injury is not traceable to

2   either Kinro or Kinro Texas LP, because Kinro does not manufacture

3   or sell bathtubs, which are sold by its "indirect" subsidiary Kinro

4   Texas LP.  However, Domenic Gattuso, Executive Vice President and

5   CFO of Kinro, stated that Kinro Texas LP was only created for tax

6   purposes and its status as a separate entity does not affect

7   Kinro's assets or operation.  (Parisi Decl. Ex. 16 at 27:3-19.)

8   Gattuso also testified that Kinro has discretionary control over

9   Kinro Texas LP's financial resources, that one of Kinro's officers

10   manage Kinro Texas LP's daily operations, and that all Kinro Texas

11   LP sales staff report to a Kinro officer.  (Id. at 58:4-60:6,

12   69:21-70:13 119:11-17.)

13    Accordingly, the Court finds there is a genuine issue of

14   material fact as to whether Kinro manufactures and sells bathtubs

15   together with Kinro Texas LP, and sold them to Plaintiffs.

16    B.   UCL Claims

17    The major purpose of the California UCL is "the preservation

18   of fair business competition."  Cel-Tech Communications, Inc. v.

19   Los Angeles Cellular Telephone Co., 20 Cal.4th 163, 180 (Cal.

20   1999). The UCL authorizes civil suits for "unfair competition,"

21   which it defines as "any unlawful, unfair or fraudulent business

22   act or practice and unfair, deceptive, untrue or misleading

23   advertising." Cal. Bus. & Prof. Code § 17200; In re Tobacco Cases

24   II, 41 Cal. 4th 1257, 1266 (Cal. 2007).

25    The UCL imposes two requirements for statutory standing -

26   injury in fact and causation.  Hall v. Time, Inc., 158 Cal. App.

27   4th 847, 852 (Cal. Ct. App. 2008).  The Court will examine each

28   requirement in turn.

1.   <u>Statutory Injury</u>

An injury under the UCL occurs where the plaintiff has: "(1) expended money due to the defendant's acts of unfair competition . . . (2) lost money or property . . . or (3) been denied money to which he or she has a cognizable claim." <u>Hall</u>, 158 Cal. App. 4th at 855.  Plaintiffs' claims are based on one common injury, the purchase of a defective or non-compliant bathtub, despite Defendants' representations of compliance.

An affirmative misrepresentation of product qualities may constitute either an unlawful or fraudulent business practice under the UCL.  <u>Consumer Advocates v. Echostar Satellite Corp.</u>, 113 Cal. App. 4th 1351, 1362 (Cal. App. 2d Dist. 2003)(stating that under the UCL even a "perfectly true statement couched in such a manner that it is likely to mislead or deceive the consumer, such as by failure to disclose other relevant information, is actionable"); <u>see also</u> Cal. Civ. Code § 1710 (actionable deceit is either a statement of fact "by one who does not believe it to be true" or a statement of fact by one "who has no reasonable ground for believing it to be true").

Defendants concede that they placed warranties on every bathtub during the period in which Plaintiffs purchased their manufactured homes, and that these warranties included representations of compliance with the E162 protocol.  (Gibbs Decl. Ex. G.)  Indeed, Defendants would not have been able to sell their products to Plaintiffs without representing that their tubs complied with HUD standards.  (Gibbs Decl. Ex. KK at 127:2-134:6.) Additionally, Plaintiffs tested Gonzalez's bathtub under the E162 protocol and determined that it failed.  (Gibbs Decl. Ex. E ¶ 3.)

1    Therefore, there is a genuine dispute as to her injury.   For

2    Royalty, Plaintiffs present no direct evidence of injury, because

3    his bathtub has not been tested and he does not know whether it

4    complies with HUD fire safety regulations.   Plaintiffs initially

5    present the following circumstantial evidence to suggest that

6    Royalty's bathtub is one of many non-compliant tubs:

7
            1) failing E162 protocol test results from three bathtubs
8           (including Gonzalez's); (Gibbs Decl. Ex. E, Zicherman Expert
            Report ¶ 3-4; Rajan Decl. ¶ 12 Ex. 30)
9           2) a failing room fire test of one bathtub; (Parisi Decl. ¶ 29
            Ex. 15 at 15)
10          3) failing E162 protocol tests of two plastic resins that were
            used to create somewhere between 9 and 33[10] percent of the
11          bathtubs made by Kinro from 2001 to 2007.[11]   (Parisi Decl. ¶
            17-18; Ex. 4-5, 12.)
12
     To summarize - Plaintiffs' evidence is that there are four bathtubs
13
     which failed flame-spread testing and between 9 and 33 percent of
14
     the materials used to make Defendants' bathtubs from 2001 to 2007
15
     are not HUD-compliant.   Even granting every reasonable inference to
16
     Plaintiffs, this evidence is insufficient to show that Royalty's
17

18   _____

19       [10] Plaintiffs originally presented evidence suggesting this
     number was as high as 43 percent.   Supplemental evidence submitted
20   by the parties now puts the percentage at somewhere between 9 and
     33 percent.   (D.'s Supp. Brief; Supplemental Parisi Decl. ¶ 7.)
21
         [11] Plaintiffs provide "batch reports" from Defendants'
22   plastics supplier Spartech, which state that 43% of all plastic
     sheets supplied to Defendants for bathtub formation from 2001 to
23   2007 were made from two particular resins - "952 virgin over
     EXABS01" or "952 virgin over regrind."  (Parisi Decl. ¶ 17.)  In
24   2005, for research, Defendants tested these two resins with 10% to
     20% fire retardant added, with a result that the resins still
25   failed the E162 protocol.   (Parisi Decl. Ex. 5.)  Defendants argue
     that they never used the plastic from this research testing in
26   their products (Mitchell Decl. ¶ 10), but the only distinction
     evident from the batch reports is that Defendants never used flame
27   retardant in their bathtubs.   Therefore, it is reasonable to infer
     from Plaintiffs' evidence that if Defendants had not used flame
28   retardant in the 2005 testing, the resins would still have failed
     to meet the required flame-spread index.

1  bathtub is non-compliant.  There is no evidence connecting

2  Royalty's bathtub to the materials that Plaintiffs argue are non-

3  compliant, and no relationship between his bathtub and the other

4  four.  Nevertheless, the Court ultimately finds that there is a

5  genuine dispute as to whether Royalty suffered an injury in fact

6  from a defective bathtub, because there is a genuine dispute as to

7  whether Defendants had a reasonable basis to assert that <u>any</u> of

8  their tubs satisfy federal fire-safety standards.

9       Kinro Vice President William Mitchell stated that, since 2001,

10 Defendants' plastics supplier has understood that all ABS plastic

11 supplied to Defendants should have a flame spread index below 200.

12 (Mitchell Decl. ¶ 5.)  However, Spartech representative Brian

13 Reniker contradicts this testimony, and said that Defendants have

14 never required Spartech to certify that the ABS plastic it supplied

15 Defendants achieved this flame-spread rating - and Spartech

16 continues to refuse to do so.  (Gibbs Decl. Ex. P. at 216, 231-32.)

17 Mitchell also testified that Defendants tested their ABS plastic

18 every six months from 2001 to 2007 with the E162 protocol at

19 Universal Laboratories, Inc., which consistently produced results

20 with a flame spread index below 200.  (SGI ¶ 9.)  Again, this

21 evidence is contradicted.  Plaintiffs' expert Dr. Vytenis

22 Babrauskas states that "[n]either [Defendant Kinro Texas LP] nor

23 its supplier Spartech have ever presented any flame spread test

24 results which would properly reflect the actual expected fire

25 performance of [Defendant Kinro Texas LP's] products that have been

26 put into the stream of commerce," under either the E84 or E162

27

28

1  protocol.  (Gibbs Decl. Ex. D ¶ 8.)[12]  Additionally, Babrauskas

2  states that "[d]espite the claims on the label affixed by Better

3  Bath/Kinro Composites onto their bathtubs claiming compliance with

4  ASTM E 162 requirements . . . [Defendants'] ABS bathtubs will not

5  achieve a passing flame spread rating . . . in a properly conducted

6  test."[13]  (Id. ¶¶ 20-21.)  Furthermore, Charles Stanley, Director

7  of Universal Laboratories, testified that the only reason

8  Defendants' bathtubs received a passing score under the E162

9  protocol at his laboratory was because they were coated with a fire

10  retardant. (Gibbs Decl. Ex. C Stanley Affid. ¶ 7.) Fire retardant

11  has never been applied to Defendants' finished bathtubs or the ABS

12  material which comprises them.  (Gibbs Decl. Ex. NN Mitchell Dep.

13  32:7-10.)

14      Defendants' other evidence, including their evidence of

15  passing fire-safety scores under the E84 protocol after 2007, is

16  similarly contested by Plaintiffs.  For example, Babrauskas

17  testifies that all of Defendants' E84 protocol testing is invalid,

18  because their labs used supports made of metal which artificially

19  reduced the flame spread index.  (Gibbs Decl. Ex. N. ¶ 23.)

20  Babrauskas also states that the E84 results were stopped early, and

21  consequently Defendants should have done an additional test for the

22

23      [12]  Babrauskas' opinion is in part based on the fact that

24  Defendants never tested the "finished surface" of their bathtubs
   and instead tested material prior to the "thermoforming" that is

25  required to turn plastic sheets into a bathtub.  (Id. ¶¶ 6, 19-21.)

26      [13] Defendants objects to this and other sections of
   Babrauska's opinion, without explanation, on the grounds that it is

27  an "inadmissible legal opinion."  The Court disagrees, as
   Babrauska's opinion is introduced to demonstrate that bathtubs do

28  not actually meet HUD's flame-spread requirements, not any legal
   conclusion based on this opinion.

risk of fire "flashover," called the "ASTM E603 Standard Room Fire Scenario." (Id.)  When Plaintiffs conducted the E603 test on Defendants' bathtub, a flashover occurred. (Parisi Decl. Ex. 15.) After reviewing the E603 test, Babrauskas stated that "[a] bathtub showing such severe fire behavior upon exposure to a small ignition source represents a very serious fire hazard." (Gibbs. Decl. Ex. N. ¶ 30.)

In addition, Plaintiffs' evidence suggests that there is enormous variety in both the plastic resin and amount of "regrind" (excess plastic material re-integrated into new tubs) used in Defendants' bathtubs.  The type of resin and amount of regrind have a direct affect on flame spread characteristics.  Defendants' own 2005 research showed failing test results in every type of plastic resin used when any regrind was used, even with flame retardant added. (Parisi Decl. Ex. 5.)  From 2001 to 2007, the amount of regrind used to make ABS sheet also varied greatly. (Parisi Decl. ¶ 18.)  In 2005, when Gonzalez bought her tub, the regrind varied from 0 to 87.9 percent. (Id.)  In 2006, when Royalty bought his tub, the regrind varied from 0 to 87 percent. (Id.)  This variety undermines whether Defendants' test results can be reliably applied to the bathtubs they sold during the periods when Plaintiffs purchased their tubs.

When a sticker is placed on a bathtub asserting compliance with a fire-safety standard, inherent within this assertion is the assumption that there was a reasonable basis to make it.  The fact that Defendants made such an assertion without reliable testing or records to support it is circumstantial evidence that none of their bathtubs, in fact, meet federal fire-safety standards.  This case

14

is no different than a home sold with a warranty that the roof does
not leak, when in fact the roofer does not know whether the roof is
made of shingle or papier-mâché; or than a car sold with tires that
have stated safety ratings up to 100 mph, when in fact the
manufacturer does not know if it can safely travel above 25 mph.
The consumer does not have to wait to suffer physical injury from
product defect in these circumstances, because the economic loss is
immediate – "the difference in value between what [they were]
promised and what [they] received." Chavez, 503 F. Supp. 2d at
1374; see also Paduano v. American Honda Motor Co., Inc., 169 Cal.
App. 4th 1453, 1468-1471 (Cal. Ct. App. 2009).[14]  This injury is
not merely a "mislabelling" error, where a plaintiff suffers no
tangible economic loss from defendant's misrepresentation.  See,
e.g., Chavez v. Blue Sky Natural Beverage Co., 503 F. Supp. 2d 1370
(N.D. Cal. 2007)(finding that erroneous state of origin labels did
not create an injury in fact).  The Court recognizes that a party
cannot lose "money or property" under the UCL where he or she
receives a "product or service of equivalent value in exchange for
[] payment."  Kwikset Corp. v. Superior Court, 171 Cal. App. 4th
645, at *18 (Cal. Ct. App. 2009).  However, here the only reason
Defendants' bathtubs were placed in the homes Plaintiffs purchased
was that Defendants represented the tubs satisfied fire-safety
standards.  If Defendants' testing is invalid or contrived and they

---

[14] Particularly where consumer safety is implicated, as here,
Defendants may not "wait and see" whether their bathtubs are highly
flammable based on consumer injuries, when Defendants represented
the bathtubs were safe based on mandatory federal guidelines.
Furthermore, as Plaintiffs noted at oral argument, the only test
available to Royalty or any plaintiff to independently discover
whether his bathtub complies with HUD is to use the E162 protocol,
which would destroy the tub.

1 made affirmative representations of compliance with safety

2 standards, a trier of fact is entitled to infer that Plaintiffs'

3 bathtubs are defective.

4      The Court finds there is a genuine dispute as to whether

5 Plaintiffs have suffered an injury under the UCL.

6           2.   <u>Statutory Causation</u>

7      In order to demonstrate causation under the UCL, a plaintiff

8 must have suffered economic loss "as a result of the unfair

9 competition."  Cal. Bus. & Prof. Code § 17204.  The UCL thus

10 requires a showing of causation – that the injury "results" from

11 the unfair competition – which may be shown by either a "causal

12 connection or reliance on the alleged misrepresentation."  <u>Hall</u>,

13 158 Cal. App. 4th at 855.  The circumstances in which the UCL

14 requires a showing of <u>actual</u> reliance is an open question of law in

15 California.[15]  For fraud-based UCL claims, some California and

16 federal courts have required actual reliance, although the most

17

18      [15] The California Supreme Court recently heard oral argument
19 in a case where it will decide whether every class member in UCL
   claims must suffer injury in fact and actually rely on a
20 manufacturer's misrepresentation of a product.  <u>See</u> <u>In re Tobacco</u>
   <u>II Cases</u>, 142 Cal. App. 4th 891, 900 (Cal. Ct. App. 2006), <u>granting</u>
21 <u>review at</u> 146 P.3d 1250 (2006).  Although this issue is pending, <u>In</u>
   <u>re Tobacco II Cases</u> is distinguishable from the case here.  <u>In re</u>
22 <u>Tobacco II Cases</u> focuses on the causation requirements of class
   members, and it is unclear whether the court will reach the
23 question of actual reliance versus other types of proximate
   causation.  <u>In re Tobacco II Cases</u> is also distinguishable based on
24 the sheer variety and length of defendants' advertising
   misrepresentations made to plaintiffs and class members, which
25 occurred over a period of fifty years.  <u>See</u> <u>id.</u> at 901 ("[T]he
   record makes it clear that proof as to the representative
26 plaintiffs will not supply proof as to all class members . . .
   merely as a function of the lengthy time covered by the complaint,
27 different class members would have heard different statements by
   defendants and would have had differing degrees of other sources of
28 information available to them to assess the health risks and
   addictiveness of smoking.").

recent cases addressing this issue do not require this as a general rule.  See Hall, 158 Cal. App. 4th at 849 ("We hold the phrase 'as a result of' in the UCL imposes a causation requirement; that is, the alleged unfair competition must have caused the plaintiff to lose money or property.").  Instead, causation may be shown without actual reliance, as long as the plaintiff has suffered an injury that resulted from the act of unfair competition.  See Medina v. Safe-Guard Products, Internat., Inc., 164 Cal. App. 4th 105, 115 (Cal. Ct. App. 2008)(finding, in the alternative, that there was no evidence the plaintiff relied on the defendant's misrepresentation or that the defendant's conduct otherwise caused his injury).  As noted by another district court, the purpose of the UCL would also be significantly undermined by requiring actual reliance in every case of fraud or misrepresentation.  Anunziato v. eMachines, Inc., 402 F. Supp. 2d 1133, 1137 (C.D. Cal. 2005)("The goal of consumer protection is not advanced by eliminating large segments of the public from coverage under the UCL . . . [who suffer] actual harm [but] were inattentive or . . . lacked the language skills to appreciate the particular unfair or false representation in issue. A construction of [the UCL] that [limits it] to common law fraud would not only be redundant, but would eviscerate any purpose that the UCL [has] independent of common law fraud.").

     Both Plaintiffs state that they assumed that their bathtubs complied with safety standards when they purchased their homes and that this compliance was material to them.  (Royalty Decl. ¶ 6; Gonzalez Decl. ¶ 6.)  However, Defendants argue there was no actual reliance under the UCL, because Plaintiffs concede they did not "read or see any information regarding [Kinro Texas LP's] bathtubs,

including literature or labels of any kind, and [were] not aware of the [Kinro Texas LP's] warranty on bathtubs."  (SUF ¶ 14, 21.)

The <u>Medina</u> case is instructive here.  In that case, the plaintiff purchased insurance from an unlicensed insurer, but could not show that the absence of this license - which was required by statute - caused his loss, in part because state law still required the insurer to pay any insured loss he suffered.  The court held that the plaintiff could not prove that the defendant's unlicensed status "caused him to part with the money he paid for the [insurance]."  <u>Medina</u>, 164 Cal. App. 4th at 115.  Similarly, here Defendants are selling a product that they would not be permitted to sell if their bathtubs did not comply with statutory requirements.  However, unlike <u>Medina</u>, Defendants' unfair business practice is directly related to Plaintiffs' loss - the difference in value between what they paid for a HUD-compliant bathtubs and what a tub would cost that has not been proven to satisfy fire-safety regulations (which, in any case, could not have been sold in the home they purchased).  Because no bathtub can be placed in a HUD-compliant, manufactured home that does not meet HUD fire-safety standards, Defendants' misrepresentation or omission regarding this quality was both impliedly material to Plaintiffs and caused their injury.

The Court finds there is a genuine dispute of material fact as to whether Defendants' conduct caused Plaintiffs' injury.

### 3.   Restitution and Injunctive Relief

Under the UCL, a plaintiff's remedies are limited to injunctive relief and restitution.  <u>Kasky v. Nike, Inc.</u>, 27 Cal. 4th 939, 950 (Cal. 2002).  Defendants argue that Plaintiffs'

1   injuries are not measurable.  This is incorrect.  Plaintiffs have

2   provided evidence of the cost of replacing the bathtubs from their

3   homes, and their case does not involve intangible considerations.

4        Defendants also argue that injunctive relief is foreclosed,

5   because they have ceased advertising compliance with the E162

6   protocol.  This argument does not foreclose injunctive relief as to

7   Royalty, who still owns one of Defendant's bathtubs.  Injunctive

8   relief is also appropriate here, because Plaintiffs have raised a

9   genuine dispute of material fact as to whether Defendants ongoing

10  testing under the E84 protocol to still contrived or otherwise

11  invalid.  See Consumers Union of U.S., Inc. v. Alta-Dena Certified

12  Dairy, 4 Cal. App. 4th 963, 972 (Cal. Ct. App. 1992)(noting that

13  the UCL contains "broad remedial provisions which authorize the

14  courts to correct violations," and to make such orders or judgments

15  as necessary "to prevent the use or employment of deceptive

16  advertising or unfair competition.")

17       C.   CLRA Claim

18            1.   Standing

19       A plaintiff who has suffered "any damage" caused by a

20  defendant's unlawful practice may assert standing under the CLRA.

21  Cal. Civ. Code § 1780(a); Aron v. U-Haul Co. of California, 143

22  Cal. App. 4th 796, 802 (Cal. Ct. App. 2006).

23       As discussed above, the Court finds that Plaintiffs have

24  provided evidence sufficient to create a genuine dispute as to

25  whether they suffered an injury in fact.

26            2.   Causation

27       Similar to the UCL, CLRA actions may be brought only by a

28  consumer whose damages are the "result of" the use or employment of

19

1  a proscribed method, act, or practice.  Cal. Civ. Code § 1780(a).

2  Causation is a "necessary element of proof . . . [and] plaintiffs

3  in a CLRA action must show not only that a defendant's conduct was

4  deceptive but that the deception caused them harm."  Buckland, 155

5  Cal. App. 4th at 809 (internal citations omitted).  However, for a

6  fraud-based claim under the CLRA, actual reliance is required.  Id.

7  at 810 ("[P]laintiffs asserting CLRA claims sounding in fraud must

8  establish that they actually relied on the relevant representations

9  or omissions.").

10      Both Plaintiffs concede that they did not read the warranties

11  on Defendants' bathtubs before removing the labels containing them.

12  As such, Plaintiffs concede they did not actually rely on

13  Defendants' affirmative representation.  See, e.g., Mirkin v.

14  Wasserman, 5 Cal. 4th 1082, 1087 (Cal. 1993)(finding no actual

15  reliance where plaintiffs did not actually read or hear defendants'

16  misrepresentations).

17      As there is no genuine dispute on this issue, the Court grants

18  Defendants' motion as to Plaintiffs' claims under the CLRA.

19      D.   Song-Beverly Act - Implied Warranty Claim

20      The Song-Beverly Act implies a warranty of merchantability

21  into all sales of consumer goods and requires that the goods:

22
        1) pass without objection in the trade under the contract
23      description;
        2) be fit for the ordinary purposes for which such goods are
24      used;
        3) be adequately contained, packaged, and labeled; and
25      4) conform to the promises or affirmations of fact made on the
        container or label.
26

27  Cal. Civ. Code § 1791.1.  The implied warranty "provides for a

28  minimum level of quality" in products.  Am. Suzuki Motor Corp. v.

1  <u>Superior Court</u>, 37 Cal. App. 4th 1291, 1295-96 (Cal. Ct. App.

2  1995).  "The core test of merchantability is fitness for the

3  ordinary purpose for which such goods are used."  <u>Isip v. Mercedes-

4  Benz USA, LLC</u>, 155 Cal. App. 4th 19, 26 (Cal. Ct. App. 2007).  For

5  example, in the realm of automobiles, the implied warranty is only

6  breached where the vehicle manifests a defect that is "so basic it

7  renders the vehicle unfit for its ordinary purpose of providing

8  transportation."  <u>Am. Suzuki Motor Corp.</u>, 37 Cal. App. 4th at 1298.

9       The ordinary purpose of bathtubs is to hold water for bathing.

10 Even assuming Plaintiffs' bathtubs fail federal fire safety

11 standards, this quality does not affect the tubs' ability to

12 accomplish their basic purpose.  Plaintiffs' only evidence

13 connecting fire and ordinary use is one circumstance where a candle

14 was left burning on a bathtub, and caused the tub to ignite.

15 However, it appears that the majority of Defendants' tubs did

16 "'what they were supposed to do for as long as they were supposed

17 to do it.'"  <u>Id.</u> at 1298 (quoting <u>Feinstein v. Firestone Tire &</u>

18 <u>Rubber Co.</u>, 535 F. Supp. 595, 603(S.D. N.Y. 1982)).  A small,

19 unrepresentative incident is not sufficient to create a dispute of

20 material fact.  <u>Id.</u>

21      Therefore, the Court grants Defendants' motion as to

22 Plaintiffs' implied warranty claims.

23      E.   <u>Magnuson-Moss Act and Song-Beverly Act - Express Warranty</u>

24           <u>Claims</u>

25      The Magnuson-Moss Act creates a federal private cause of

26 action for a warrantor's failure to comply with the terms of a

27 written warranty.  <u>Milicevic v. Fletcher Jones Imps., Ltd.</u>, 402

28 F.3d 912, 917 (9th Cir. 2005)(citing 15 U.S.C. § 2310(d)(1)(B)).

1   Magnuson-Moss does not create additional federal warranty law

2   unless specifically stated, and otherwise calls for "the

3   application of state written and implied warranty law."  Walsh v.

4   Ford Motor Co., 807 F.2d 1000, 1012 (D.C. Cir. 1986); Brothers v.

5   Hewlett-Packard Co., 2007 U.S. Dist. LEXIS 13155, *28-29 (N.D. Cal.

6   2007).  In California, express warranties are not created unless

7   they are "part of the basis of the bargain."  Cal. U. Com. Code §

8   2313(1)(a)-(c); Williams v. Beechnut Nutrition Corp., 185 Cal. App.

9   3d 135, 141 (Cal. Ct. App. 1986)("In order to plead a cause of

10  action for breach of express warranty, one must allege the exact

11  terms of the warranty, plaintiff's reasonable reliance thereon, and

12  a breach of that warranty which proximately causes plaintiff

13  injury.") Similarly, the Song-Beverly Consumer Warranty Act, Cal.

14  Civ. Code § 1790 et seq., protects consumers who have purchased

15  products covered by an express warranty.  Robertson v. Fleetwood

16  Travel Trailers of California, Inc., 144 Cal. App. 4th 785, 798-799

17  (Cal. Ct. App. 2006)(internal citation omitted).

18       Defendants concede that an express warranty exists for the

19  bathtubs at issue, which provides that:

20

21       Under normal use and service, should a unit be termed
         defective by an authorized Better Bath representative, within
22       [a specified number of years] from original consumer purchase,
         it will be the manufacturer's option to repair or replace the
         defective unit or component.
23

24  (SUF ¶ 42.)  Defendants first argue that their product had no

25  defect which was covered by the express warranty, because either

26  their tubs were HUD-compliant or the bathtubs were otherwise

27  useable for bathing.  Again, Plaintiffs dispute whether the

28  bathtubs are defective or nonconforming, because they do not

                                    22

1  satisfy fire-safety standards.  However, Plaintiffs concede that

2  they did not see or hear any representations by Defendants

3  regarding the bathtubs' compliance with HUD safety standards before

4  they bought their homes and tubs.  (SUF ¶ 14, 21.)  Plaintiffs

5  provide no other evidence[16] to contradict these facts.  While a

6  buyer

7

8      need not show that he would not have entered into the
       agreement absent the warranty or even that it was a dominant

9      factor inducing the agreement[,] . . . . if the resulting
       bargain does not rest at all on the representations of the
       seller, those representations cannot be considered as becoming

10     any part of the "basis of the bargain."

11  Keith v. Buchanan, 173 Cal. App. 3d 13, 22 (Cal. Ct. App.

12  1985)(internal citations omitted).  As Plaintiffs have not shown

13  that their purchase in any way was related to the bathtubs' express

14  warranties, these could not have become a part of the basis of the

15  bargain between the parties.

16      As there is no genuine dispute of material fact on this issue,

17  the Court grants Defendants' Motion as to Plaintiffs' express

18  warranty claims under the Song-Beverly and Magnuson-Moss Act.

19      F.   Misrepresentation and Fraudulent Concealment

20      Under California law, the elements of fraud are:  (1)

21  misrepresentation or omission of a material fact; (2) knowledge of

22  falsity; (3) intent to defraud, i.e., to induce reliance; (4)

23  justifiable reliance on the misrepresentation; and (5) resulting

24

25      [16] Plaintiffs allege, without providing supporting evidence,
    that they were provided a copy of California Civil Code §§ 1797.3

26  and 1797.4, which provide general warranties for manufactured home
    purchasers.  See Cal. Civ. Code §§ 1797.3-1797.4.  Even assuming

27  that these statutes were provided to Plaintiffs, which is
    unsubstantiated, this does not alter the fact that Defendants'

28  bathtub warranties did not become a part of the basis of the
    bargain, as Plaintiffs were not aware of Defendants' warranties.

1   damage.  Small v. Fritz Co. Inc., 30 Cal. 4th 167, 173 (Cal. 2003);

2   see also Blickman Turkus, LP v. MF Downtown Sunnyvale, LLC, 162

3   Cal. App. 4th 858, 868 (Cal. Ct. App. 2008)(holding that in a

4   fraudulent concealment case, "a duty to disclose can arise from the

5   making of affirmative representations with knowledge of undisclosed

6   facts that materially qualify the facts disclosed, or render the

7   disclosed facts likely to mislead").

8       The parties only briefly address these claims, relying on

9   their arguments in support of the UCL and CLRA claims.  Common law

10  misrepresentation or omission, like the CLRA, requires a showing of

11  actual reliance.  Buckland, 155 Cal. App. 4th at 807 ("A plaintiff

12  asserting fraud by misrepresentation is obliged to plead and prove

13  actual reliance . . . .").  The Court has already described

14  Plaintiffs' failure to demonstrate actual reliance on Defendants'

15  misrepresentation.  The Court further finds that there is no

16  substantive difference between Plaintiffs' claims for

17  misrepresentation and fraudulent concealment.  Both claims address

18  the same conduct and injury - that Defendants affirmatively

19  represented compliance with federal testing when, in fact, their

20  tubs do not meet these standards.  "Where failure to disclose a

21  material fact is calculated to induce a false belief, the

22  distinction between concealment and affirmative misrepresentation

23  is tenuous . . . An active concealment has the same force and

24  effect as a representation which is positive in form." Outboard

25  Marine Corp. v. Superior Court, 52 Cal. App. 3d 30, 38 (Cal. Ct.

26  App. 1975).  Plaintiffs have further provided no evidence that, had

27  accurate test results been disclosed to them, that they "would have

28  been aware of it and behaved differently." OCM Principal

1 | <u>Opportunities Fund, L.P. v. CIBC World Markets Corp.</u>, 157 Cal. App.

2 | 4th 835, 864 (Cal. Ct. App. 2007).

3 |      Accordingly, the Court grants Defendants' motion with respect

4 | to Plaintiffs' misrepresentation and fraudulent concealment claims.

5 | **IV.   CONCLUSION**

6 |      The Court GRANTS in part and DENIES in part the motion for

7 | summary judgment.

8 |

9 | IT IS SO ORDERED.

10 |

11 | Dated: May 18, 2009

12 |                                      DEAN D. PREGERSON

13 |                                      United States District Judge